Denise M. De Mory (SBN 168076)
ddemory@bdiplaw.com
Corey Johanningmeier (SBN 251297)
cjohanningmeier@bdiplaw.com
Michael Flynn-O'Brien (SBN 291301)
mflynnobrien@bdiplaw.com
Gareth De Walt (SBN 261479) (*pro hac vice forthcoming*)
gdewalt@bdiplaw.com
Bunsow De Mory LLP
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7248

Ari Karen (*pro hac vice* forthcoming)
akaren@mitchellsandler.com
V. Amanda Witts (*pro hac vice* forthcoming)
vawitts@mitchellsandler.com
Alexnader Rogosa (*pro hac vice* forthcoming)
arogosa@mitchellsandler.com
MITCHELL SANDLER LLC
1120 20th Street NW, Suite 725
Washington, DC 20036
Office: (202) 886-5265

Attorneys for Plaintiff
MOVEMENT MORTGAGE, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOVEMENT MORTGAGE, LLC,<br><br>       Plaintiff,<br><br>   v.<br><br>TODD SCRIMA,<br><br>       Defendant. | Case No.:<br><br>**MOVEMENT MORTGAGE, LLC'S COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**DEMAND FOR JURY TRIAL** |

## **COMPLAINT**

Plaintiff Movement Mortgage, LLC, by and through its undersigned counsel, hereby files this Complaint, seeking monetary relief, injunctive relief, and such other relief as the Court deems appropriate, and in support thereof, avers as follows:

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**The Parties**

1.      Plaintiff Movement Mortgage, LLC ("Movement" or "the Company") is a Delaware limited liability corporation with a principal place of business at 8024 Calvin Hall Road, Fort Mill, SC 29707.

2.      Defendant Todd Scrima ("Defendant Scrima") is an individual who currently resides at 1221 Mariemont Avenue, Sacramento, CA 95864.

**Jurisdiction and Venue**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

4.      This Court has personal jurisdiction over Defendant Scrima because he is a resident of California and because of the intentional tortious activity he engaged in from California.

5.      Defendant Scrima has engaged in tortious conduct, misappropriated and caused the misappropriation of trade secrets, computer files and data, and other confidential and proprietary information.  He has engaged in corporate espionage against Movement for the purpose of benefitting himself and his competing company, Summit Funding, Inc. ("Summit"), for which he is the founder, owner, and serves as President.  Summit is a competing mortgage corporation organized under the laws of the State of California with a principal place of business at 2135 Butano Drive, Suite 150, Sacramento, CA 95825.  In connection therewith, Scrima has tortiously interfered with Movement employment contracts and personally implemented a scheme to improperly divert customers and protected borrower non-public information from Movement to his company, Summit to enrich Summit and himself personally.

6.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims asserted herein occurred in this District and/or were otherwise directed to this District, and Defendant is subject to jurisdiction in this District.

COMPLAINT

**Factual Background**

7.      Movement was founded in 2008 and operates as a provider of real estate financing solutions, offering its customers a variety of mortgage products.

8.      Movement pioneered a unique approach to home loans centered around helping homebuyers quickly and easily identify their ability to finance a home purchase and expeditiously obtain financing in order to close with speed and efficiency on home purchase transactions.

9.      Movement's ultimate goal with its business plan was empowering employees to help them sustain longstanding relationships with consumers and avoid any need for Movement to buy customer leads or develop internet-based leads that are common for most other lenders in the industry.  Movement's system establishes its employees as agents and ambassadors generating repeat business for the company and natural referrals with brand recognition.  Movement's employees are specifically used to promote its brand and maintain and expand its relationships that are critical to the Company's success.  The Company's processes reinforce their relationships beyond typical industry norms and bind customers and referral sources to the Company through connections with employees that promote the Company's reputation to individual borrowers and referral sources, such as real estate industry professionals.  Indeed, the Company's tagline "Have I made you a raving fan today" reflects its culture that its processes and systems are specifically designed to ingratiate and promote its people to other real estate industry professionals and borrowers alike, meaning that its employees become a legitimate resource and asset in the Company's value and success.

10.      Movement expends a significant amount of time and resources to develop its brand and to market itself to potential borrowers.  It has taken Movement years to build up the reputation and client base that Movement uses to generate revenue. Based on its investment in and commitment to its business plan, Movement rapidly grew and expanded to be one of the largest independent mortgage lenders in the United States.  Movement currently employs over 4,500 employees across 775 locations in all 50 states of the country.

COMPLAINT

11.     Summit, on the other hand, was founded by Scrima in 1995, more than a decade before Movement commenced operations.  Despite the nearly thirty years of operations, during which Scrima has led the company as President and/or CEO, Summit had fewer than 200 loan officers  until Scrima engaged in a desperate and unlawful scheme to copy Movement's successful business model.

**Employment and Contractual Obligations of Movement Employees Targeted by Defendant**

12.     Todd Scrima developed a scheme to initiate a corporate raid of Movement's employees using the Company's former high-level managers.  However, Scrima recognized that Summit was not able to successfully compete with Movement, recruit its staff, or be competitive in the marketplace even with those former members on board if he did not also steal Movement's trade secrets and computer files.  Accordingly, Scrima personally orchestrated a plan to steal Movement's trade secrets to facilitate his plans to raid its employees and copy its business model.

13.     After offering lucrative compensation deals, Scrima directed Movement employees to access and steal Movement trade secrets from Movement's computer systems.

14.     At all times Scrima knew that Movement employees he targeted as agents for his corporate espionage owed fiduciary duties to Movement since they served in high-level managerial positions and/or were entrusted with sensitive trade secrets and confidential and proprietary information regarding Movement's operations, strategies, and employees.

15.     At all times Scrima knew that Movement employees he targeted and directed to aid in the solicitation of other Movement employees were bound by Confidentiality and Non-Solicitation Agreements they entered into with Movement as material terms and consideration for their employment with Movement in exchange for the fair salary compensation they received from the Company.

16.     Scrima knew these Agreements required the employees to use Confidential Information, as defined therein, solely for the benefit of Movement and not to disclose such confidential information, even after the termination of their employment with Movement.

17.    The employees Scrima solicited and induced to solicit additional Movement employees and breach their contractual obligations and/or fiduciary duties include but are not limited to Executive Vice President of Recruiting Deran Pennington ("Pennington"), Divisional Leader Matt Schoolfield ("Schoolfield"), Divisional Leader Chris Shelton ("Shelton"), Divisional Support Partner and Licensed Loan Officer Assistant Linda Plymale ("Plymale"), BPS Market Leader Heather Frye ("Frye"), Profit Market Leader Josh Covett ("Covett"), Branch Leader David Vese ("Vese"), Regional Sales Director Bart Evans ("Evans"), and Profit Market Leader Chris McCabe ("McCabe").

18.    All of these Former Employees had Confidentiality and Non-Solicitation Agreements with Movement[1] which ensured they would not solicit or recruit any Movement employee, directly or indirectly, nor identify Movement employees as potential candidates to third parties.  Given the nature of their employment positions and in reliance on their representations and contractually binding agreements with Movement, the Company entrusted them with confidential information regarding Movement's operations, strategies, and employees.

19.    Pennington began his employment at Movement on or about May 1, 2008, as the eighth employee to join the Company.  His initial role was as a loan officer, but his primary responsibility for years thereafter was to grow Movement's production staff.  Given the nature of Pennington's position and longevity with Movement, Movement entrusted Pennington with confidential and proprietary information regarding Movement's operations, strategies, and employees.

20.    Pennington's employment contract, signed on April 28, 2008, confirmed that he would not render services to any other person or business besides the Company during the course of his employment.  He agreed not to solicit any Company employee or employee of a Company affiliate to leave their position during the course of his employment or for six months thereafter, whereas the other Former Employees were enjoined from such solicitation for twelve months.  Pennington's contract also confirmed he would be given the Company's confidential and

---

[1] Movement was formerly known as New American Mortgage, LLC.

COMPLAINT

proprietary information during the course of his employment and he agreed not to disclose it, reproduce, or produce any compilations of that information and that the obligations survived termination of the contract.

21.     Plymale's duties included serving as an assistant to Shelton during her employment at the Company.  As Shelton's assistant, Plymale had unprecedented access to Movement's trade secrets, and confidential and proprietary information concerning onboarding, recruiting, training, coaching, and Movement's overall business methods.  Few employees at Movement had Shelton's level of access, which as a natural result gave Plymale unique and extensive access.

### Theft of Trade Secrets and Computer Files

22.     Upon information and belief in or about March 2023, Scrima entered into conversations with Pennington regarding potential employment with Summit centered upon his ability to solicit numerous Movement employees to come to Scrima's company with him.

23.     Specifically, in March 2023, while still employed with Movement, Pennington executed a Confidentiality Agreement with Scrima's company, Summit (the "Summit Confidentiality Agreement).  *See* March 2023 Confidentiality Agreement, attached hereto as Exhibit A.

24.     Following the execution of the Summit Confidentiality Agreement, Scrima and Pennington agreed that he would hold off from informing Movement about his resignation and would continue to work at the Company on paper for approximately four months.

25.     During these four months Pennington continued to receive compensation from Movement and was entrusted with Movement's trade secrets and confidential and proprietary business information.  However, during this period Scrima coordinated with Pennington to surreptitiously solicit and recruit Shelton, Schoolfield, and Plymale to leave Movement and to assist Scrima in stealing Movement's trade secrets and confidential and proprietary information.

26.     Upon information and belief, Scrima directed his company to pay an outsized signing bonus to Pennington in an amount believed to be upwards of two million dollars and signing bonuses to Shelton and Schoolfield of as much as one million dollars each.  Given that Pennington,

COMPLAINT

Schoolfield, and Shelton do not produce loans or otherwise generate revenue themselves, the only reason for Scrima to award these payments was to incentivize the illicit activities as described herein.

27.     On May 24, 2023, at 1:08 pm Scrima texted a group of executives at Summit that he "had a great call with Daren working on the first 90 day plan" and provided the contact information for Linda Plymale who would assist with accomplishing the plan. *See* Scrima Group Text attached as Exhibit B.

28.     Not coincidentally, Movement records show that Plymale almost simultaneously with the timing of Scrima's text, began accessing Movement's database that contains highly proprietary information regarding the Company's financials, employees, compensation information, margins, borrowers, and loan products.   Plymale also began focusing her data reviews on Movement's Top 100 loan officers.   Within one week of Scrima's text Plymale had pulled confidential Movement reports about its top loan officers.

29.     In the weeks that followed, Plymale began an unprecedent use of Movement's computer system, DOMO.[2]   For example, in the four-month period from January through April of 2023, Plymale rarely accessed DOMO.   In May and June of 2023, Plymale began regularly accessing the system.

30.     Further, when accessing DOMO, Plymale downloaded a number of specific reports that she rarely examined and a combination of reports that she had never previously accessed in the course of her job duties during her lengthy career at Movement, demonstrating an intent to evaluate loan officer performance from a variety of perspectives.

---

[2] Movement maintains critical and highly confidential data pertaining to the performance of its loan officers on a system called DOMO, which tracks every aspect of a loan officer's performance relating to volume, loan products sold, pull through rate, loan performance, and a host of other data critical to ascertaining the profitability and risk profile of the loans closed by its loan officers.  This information is particularly valuable because it would allow a competitor to ascertain with certainty (i) whether the type of loans closed by a loan officer meet its specific product matrix (ii) whether the loans are the type that the competitor wants to close; and (iii) by understanding up-to-date performance, identify the exact amount of compensation that can be offered to the loan officer without compromising corporate profitability.

COMPLAINT

31.     Plymale's use of Movement's system and acquisition of trade secrets and confidential and proprietary information did not cease with her resignation from the Company. Indeed, after her resignation and before she returned her Movement computer, Plymale downloaded and exported reports from DOMO including but not limited to the LO Pipeline Reports and reports entitled "Loan Officer File Quality," "Loan Pull," "LO Summary," "Ultimate Loan Pull Table," and "Funded By Subsidy."  These reports provide critical information about the profitability and performance of the loans closed by each loan officer, loan officer's current and historical volume, the interest rates charged to each loan officer's clients, the product types sold by each loan officer, the amount of exceptions to loan pricing and subsidies the loan officer provides, the types of customers they routinely service and a host of details that would allow someone unprecedented analysis of each loan officer's performance, profitability, and how that performance might translate to another company, market, and product mix available from another lender.

32.     Additionally, the information accessed likely contains detailed customer information including but not limited to customer contact information, credit score, income, and a variety of personal financial data and non-Public Information that was entrusted to Movement by consumers, which the federal Gramm Leach Bliley Act prohibits from dissemination without customer consent due to its highly personal and sensitive nature.

33.     Movement has learned that on July 3, 2023 -- the date of her resignation -- Plymale installed Dropbox on her computer and, upon information and belief, created a Google Drive (collectively "Cloud Servers").  Simultaneously therewith, she began accessing dozens of Movement documents concerning Movement's proprietary information and trade secrets on the details of how it recruits, onboards, and trains loan officers as well as the functions of various positions and overall business methods.  These documents include details developed with the investment of hundreds of employee hours, through consultations with experts and legal counsel, and with the benefit of years of trial and error.  They reflect Movement's unique business methods which allow loan officers to identify the best products for customers and the loans a borrower is most likely to qualify for, allowing the identification of potential approval obstacles up front so that

borrowers can make more informed decisions earlier in the loan process and can be provided more accurate information at the outset of a loan application.

34.     Additionally, these documents include training manuals, reference manuals; coaching manuals, unique proprietary relationships with investors and vendors; checklists; calculators; internal timelines; internal deadlines; job specific resource guides; templates; communication protocols; internal workflows; and streamlining and efficiency standards and protocols for a variety of critical positions in loan underwriting, processing and closing that effectuate Movement's proven business methods.[3]  No one person would know all of this information.  Indeed, the details and tools relevant to even a single position are so comprehensive that people within that specific job function would be unable to recall and utilize the extensive tools and methodologies without accessing these materials.  Not only did Plymale access and copy these materials for a specific Movement position – she copied them with respect to nearly every critical function at Movement.  Moreover, she copied documents reflecting how each of these tools and methods related to one another and effectuated Movement's overall business strategy at a macro and micro level.  By way of analogy, this did not merely provide Scrima with a recipe in a cookbook, he got a copy of the entire cookbook, the details of every food supplier, the details of every piece of equipment in the kitchen as well as the resume, reviews, and experience information for every single cook and every dish the cooks ever prepared.[4]

---

[3] Just a few of these materials include by way of example, Movement documents entitled: The Process; Reference and Training Guide for Greenville Market LOs and LOAs; LOA Process: New Hire Reference Book; New Hire Welcome Reference Book; A to Z file Flow; How to Complete the Submission Checklist Guide; How to deliver a VIP Onboarding Experience; Guideline for Pipeline Managers.

[4] The nature of the documents accessed and likely copied by Plymale included virtually every document needed to replicate Movement's business plan both on a macro and job specific micro level.  Documents accessed by Plymale detail Movement's onboarding, training, and continuing internal education for staff and how Movement frontloads the evaluation and processing of applications, along with the Company's proprietary system of overlapping and integrating different aspects of the loan application and approval process.  This allows Movement to approve loans expeditiously, identify potential problems up front, and avoid "last minute surprises" in the mortgage process that often place borrowers in no-win or stressful situations when fewer alternatives are available.  Additionally, crucial details about loan officer performance and profitability and Movement's unique methods of recruiting, onboarding, and training were accessed

35.     Moreover, the access duration shows that these documents were typically accessed for less than a minute, meaning that Plymale was not reading the documents. Rather, the duration of access is consistent with the document being selected for copying and the duration of time it takes for an upload of the documents to Cloud Servers.

36.     Further, Plymale did not return her laptop on July 7th, the effective date of her resignation as required. On July 10th and 11th – after she commenced employment with Summit – she accessed approximately one hundred of these critical infrastructural Movement documents. Many of these were contained in the Cloud Servers that Plymale set up the day that she resigned. While Movement has a snapshot of the activity, given it does not have access to the Cloud Servers themselves, upon information and belief there is substantially more data which Scrima misappropriated and accessed through this process.

37.     Movement has learned that on July 8th or 9th of 2023, Plymale met with Shelton and together they traveled to Summit's headquarters at Scrima's directions. Thus, when Plymale accessed Movement's proprietary information and trade secrets in the days following her resignation she was also visiting Summit's corporate offices.

38.     Before returning her Movement laptop, Plymale deleted all of the files she accessed and/or downloaded at the time of creating the Cloud Servers and the files she accessed after joining Summit.

39.     Plymale was not the only person Scrima evidently solicited to obtain Movement's trade secrets. Beginning in June of 2023, Scrima began directing his staff to obtain additional trade secrets through Pennington, Schoolfield, and Shelton, while they remained in Movement's employ.

40.     On June 5, 2023, Scrima texted Summit's former Chief Growth Officer, Brian Mitchell "Did you granulize pricing from the big deal more? And did you receive P&Ls?" *See* June 5th Text Exchange attached as Exhibit C. Mr. Mitchell stated that he had requested it from Deran Pennington as instructed but might need to get it from Matt Schoolfield and asked "Are you

---

and likely copied. There were literally hundreds of internal Movement documents accessed and likely copied by Plymale at Scrima's directions *after* Plymale resigned.

COMPLAINT

sure you want movement p&ls's (their proprietary/confidential docs) on summit servers?" *Id.* Scrima replied, "Not on our servers. Can you maybe set up misc whatsapp account and have them texted there?" *Id.*

41.   Mr. Mitchell, concerned by these directives, did not actually undertake any effort to obtain this information from Mr. Pennington or Mr. Schoolfield.  However, on June 7, 2023, Mr. Scrima emailed Mr. Mitchell and Summit's CFO, Roy Mall, with the subject line "P&L from Deron" and instructions of "Team, Please dissect this!" *See* Mitchell Email Exchange attached as Exhibit D.

42.   Mr. Mitchell has confirmed that this email included an attachment where "every [Movement] employee is listed.  Every wage is listed.  Some 9,000 borrowers information," including margin information and substantial other data. *See* Transcript of Mitchell Recorded Call[5] attached as Exhibit E.

43.   Summit's CFO began analyzing this information over Mr. Mitchell's objections that it was inappropriate, responding that "if Todd wants me to do this, I'm going to do it. *Id.* at 14.

44.   Scrima continued to obtain and review Movement P&L's in the hopes of overhauling his company.  On September 22, 2023, he sent a Movement P&L for the branch level to his CFO, and they discussed a line-by-line comparison to Summit's data so they could incorporate Movement's strategies and "perfect it." *See* September 22, 2023 Text attached as Exhibit F.

45.   According to Mr. Mitchell, Mr. Scrima specifically told his CFO "If you look at Movement P&L, here are some pointers on how to create it and rules around it." *See* Exhibit E at 21-22.  The purpose of dissecting the P&L information was to address Movement's natural competitive advantage over Summit because Summit "had an issue with [its] margins being competitively -- being competitive when priced against some prospective branches from Movement." *Id.* at 22.

---

[5] This call was recorded with the consent of the parties. *See* Exhibit E. at pgs. 5-7.

COMPLAINT

46.     Scrima continued to obtain Movement's trade secrets and confidential and proprietary information from a variety of sources while he engaged in this corporate raid. Scrima emailed Mr. Mitchell notes from conversations with Schoolfield about Movement's confidential information for how its Tampa Bay, Florida branch operates and the manager's compensation to enable Scrima to restructure his company and offer compensation based on similar terms. *See* Scrima Email Excerpt attached as Exhibit G.

**Scrima Has Actual Knowledge of the Wrongful Nature of his Actions**

47.     At all times, Scrima knew that his conduct was wrongful. Indeed, the mere fact that he instructed staff to hide Movement files through a Whatsapp account rather than maintain them on Summit's servers speaks to the conscious nature of his activities.

48.     In fact, Scrima was specifically told of the illegal nature of his conduct. On July 10, 2023, counsel for Movement sent correspondence to Summit advising Summit that it was aware of the illegal use of Pennington to solicit Shelton and Schoolfield and that Movement received reports of the conspiracy to misappropriate Movement's trade secrets and confidential and proprietary information to solicit hundreds of employees from Movement. *See* July 10, 2023, correspondence from Ari Karen to Scott Bruggermann, attached hereto as Exhibit H.

49.     Scrima was apparently advised by his own counsel to avoid certain illegal activities but knowingly engaged in them anyway. According to Mr. Mitchell, Summit's in-house counsel told him "Todd, you're doing all the things I said we can't do." *See* Exhibit E at 17.

50.     Scrima's own employees openly and strenuously objected to his actions. On November 8, 2023, Mr. Mitchell stated in an email copied to Mr. Scrima:

> So you are aware, what the attached document sent by Deran to Todd contains, and the reason for my email tonight, is because of the legal agreements agreed to by Summit in the filings and injunction agreement with MM last week, which I have determined to be not in any way accurate by our organization. I have a moral issue with our position of what appears to be, at the minimum, an omission, or most likely a willful obstruction. I'm not sure of which yet and I am bringing this to your attention now and seeking your advice. This document, which was sent to me by Todd Scrima, and at his direction "please dissect this," is actual proprietary information owned by Movement Mortgage. This is not a proforma, but actual

COMPLAINT

consolidated Movement Mortgage results. It includes without limitation, every employees wage information, their income information, as well as all loan information on borrowers, loan details, margin information, basically "the whole enchilada" as we would say in Texas.

*See* Exhibit D.  Jack Satterlee, Summit's Vice President of Human Resources, echoed his support for Mr. Mitchell's position.  However, Scrima's response to this objection was to fire Mr. Mitchell approximately ten days later.

### Scrima Directs Staff to Steal Customer Data

51.     Scrima engaged in a coordinated scheme to solicit large portions of Movement's business, first by targeting key employees and obtaining access to trade secrets and confidential and proprietary information, then by using that material to pursue additional high-earning employees of Movement's, some of whom were used to mislead and divert customers' data from Movement to Summit.

52.     Upon information and belief, Scrima directed his company to work with Movement loan officers whose participation he coordinated to divert loans and information to Summit while they remained employed at and licensed with Movement with the intention they would later resign and join Scrima's company.

53.     The resigning loan officers ("Resigning LOs") held themselves out to the public as agents of and licensed with Movement and customers believed they were dealing with licensed loan originators of Movement.  Indeed, in communications sent to customers and on the Nationwide Mortgage Licensing System, the Resigning LOs represented to the public that they were acting on behalf of Movement Mortgage.  The Secure and Fair Enforcement of Mortgage Licensing Act (1) provides that each loan originator must conspicuously disclose the licensed entity for whom they work and (2) that a loan officer may not simultaneously work for two different licensed entities simultaneously.  The purpose of these laws is to prevent borrower confusion and improve transparency to ensure that a borrower knows exactly which entity is responsible for arranging or providing the financing for their home as well as the identity of the entity being supplied their private nonpublic information.  This transparency is critical so borrowers can hold the appropriate persons accountable in the event of any improper or unlawful activities.

13                                        COMPLAINT

54.     Unbeknownst to Movement's customers, the Resigning LOs were originating, processing, underwriting, approving, pricing, and funding consumer loans with the intention of diverting them – and in fact, did divert them – to Scrima's company, a Movement competitor.

55.     Customers provided information to the Resigning LOs with the intent and belief that such information would be maintained in confidence with Movement to originate loans with and through Movement.   In fact, unbeknownst to customers, Resigning LOs began diverting that information, without the consumer's knowledge or consent, to a wholly separate company, Summit, in violation of numerous federal financial laws.

56.     Scrima established a supposed Portfolio Retention Department at his company to facilitate this transfer of information.  A specific employee – John Felix – received this protected information from the Resigning LOs.

57.     Scrima's actions and those of his agents and coconspirators in this plot constituted a blatant violation of the Gramm Leach Bliley Act, which prohibits dissemination of this data without customer consent due to its highly personal and sensitive nature.  Additionally, the systemic actions caused consumer confusion by representing an affiliation between Summit and Movement that obviously did not exist.  At other times, Borrowers were simply misled as to what was in their best interests to facilitate the diversion of loans, without regard to potential rate changes, the effects of multiple credit checks, or how this might jeopardize borrowers' ability to ultimately secure the loan they were prepared to finalize with Movement.

58.     For example, on October 2, 2023, Movement Senior Loan Officer Tyler Henry, who would later resign to join Scrima's company outright, sent an email to a consumer who was prepared to close his loan with Movement that Mr. Henry "recommend holding off on locking, however we can go ahead and get you applied with our sister company and if rates drop, we'll lock you in there.  The only issue with this plan is transferring the appraisal.  John Felix, with Summit Funding, will be reaching out shortly with the ling to apply." *See* Henry Email attached as Exhibit I.  Mr. Henry then forwarded the email chain and all information submitted by the consumer to qualify for their loan to John Felix at Scrima's company.

COMPLAINT

59.     Upon information and belief, Scrima created the formal position for Mr. Felix at his company entitled Portfolio Retention Loan Officer to obscure what they were really perpetrating – a designed and intentional scheme to divert personal financial data of borrowers to Summit and create consumer confusion to unwittingly redirect borrowers to a Movement competitor.

60.     This was not an isolated event as Movement has identified similar examples where Mr. Felix is on email chains with Movement employees to finalize loans that originated and would have closed with Movement but for the scheme to mislead consumers and divert this business.  In another such example on October 10, 2023, Movement loan officer Bogdan Toderut contacted Mr. Felix to finalize the illicit transfer of another loan file to close with Summit which he indicated he was directed to do by David Vese, a branch leader at Movement.  *See* Toderut Email attached as Exhibit J.  Both Vese and Toderut who worked in Cumming, GA resigned their Movement positions to accept jobs at Scrima's company that same month with Scrima promoting Mr. Vese to branch manager to secure his participation.

61.     Resigning LOs worked in concert with Scrima, diverted personal nonpublic information without a customer's consent to facilitate Scrima's ability to seamlessly divert the loan.  Once in a position to do so, the Resigning LOs completed the diversion of the loans by creating actual consumer confusion when Summit was ready to move forward with the loan.

62.     This scheme, which violates multiple federal and state lending laws and regulations could not have been initiated without the knowledge, consent, and direction of Scrima.  This scheme utilized trade secrets, including the identity of ready, willing, and able borrowers prepared to close a loan with Movement who were not identified to the public, as well as their personal financial data provided to Movement in confidence to systematically divert loans to Scrima's company, Summit.

**COUNT I**
**Misappropriation of Trade Secrets in Violation of the**
**Defend Trade Secrets Act 18 U.S.C.A. § 1836**

63.     Movement incorporates all previous paragraphs as if fully set forth herein.

15                                                        COMPLAINT

64. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

65. Movement's confidential and proprietary information includes, among other things, training materials, lead lists and leads, nonpublic borrower financial and personal information, and pipeline reports constitute trade secrets under the DTSA.

66. Additionally, the stolen information included reports and data about Movement employees, their productivity, performance, compensation, and recent loan origination activities, as well as private contact information, all of which would provide a competitor a significant advantage in recruiting and soliciting them to leave the Company.

67. Movement derives independent economic value from its confidential data and trades secrets including its borrower information, customer lists, customer data, employee data, and pricing information.

68. Movement's trade secrets are related to products or services used in interstate commerce.

69. Former Employees, including but not limited to Deran Pennington and Lynda Plymale, were entrusted with trade secret information in the performance of their jobs.

70. Pennington improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets, including but not limited to Movement's P&Ls, for the use and benefit of Scrima and his company.

71. Plymale improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets for the use and benefit of Scrima and his company.

72. Scrima was aware of and facilitated Pennington and Plymale in taking and using these trade secrets.

COMPLAINT

73.     Scrima reviewed, utilized, directed, and permitted the use of these trade secrets by his company for his own personal benefit and for the benefit of the company he managed.

74.     Defendant utilized such trade secrets without Movement's express or implied consent, all to Movement's detriment.   Indeed, Summit has been able to replicate Movement operations and financials – or at least been able to create the impression thereof – sufficient to result in the successful solicitation of fifty (50) Movement employees whom Defendants could not have solicited without the trade secret and data theft described herein.

75.     As a direct result of Defendant's Actions, Movement is entitled to damages in the amount of at least Five Million Dollars.

## COUNT II

### Misappropriation of Trade Secrets in Violation of California's Uniform Trades Secrets

76.     Movement incorporates all previous paragraphs as if fully set forth herein.

77.     The California Uniform Trades Secrets Act ("CUTSA"), C.A. Gen. Stat. § 3426 prohibits the misappropriation of trade secrets.

78.     The CUTSA defines "trade secret" as information that "derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *See* C.A. Gen. Stat. § 3426.1

79.     The CUTSA defines misappropriation as "acquisition, of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:(A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." *Id.*

COMPLAINT

80.     Movement's proprietary information including, among other things, training materials, lead lists and leads, nonpublic borrower financial and personal information and pipeline reports constitute trade secrets under the CUTSA.

81.     Movement derives independent economic value from its confidential data and trades secrets including its borrower information, customer lists, and pricing information.

82.     Movement's trade secrets are related to products or services used in intrastate commerce.

83.     Former Employees, including but not limited to Deran Pennington and Lynda Plymale, were entrusted with trade secret information in the performance of their jobs.

84.     Pennington improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets, including but not limited to Movement's P&Ls, for the use and benefit of Scrima and his company.

85.     Plymale improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets for the use and benefit of Scrima and his company.

86.     Scrima was aware of and facilitated Pennington and Plymale in taking and using these trade secrets.

87.     Scrima reviewed, utilized, directed, and permitted the use of these trade secrets by his company for his own personal benefit and for the benefit of the company he managed.

88.     Defendant utilized such trade secrets without Movement's express or implied consent, all to Movement's detriment.

89.     Defendant's misconduct detailed herein constitutes misappropriation of Movement's trade secrets and violations Sections 3426 *et seq.* of the California Civil Code. As a direct and proximate result of Defendant's conduct, Movement has been damaged in amount to be proven at trial.

90.     Movement has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Defendant's misappropriation.  As a further

COMPLAINT

proximate result of the misappropriation and use of Movement's trade secrets, Defendant was unjustly enriched.

91.     Pursuant to Section 3426.2 of the California Civil Code, Movement is entitled to an injunction to prohibit Defendant from using, disclosing and/or otherwise benefiting from Movement's trade secrets; to eliminate any commercial advantage that Defendant may otherwise derive from his misappropriation; and to require Defendant to immediately return to Movement all of its confidential information, documents, and any other misappropriated materials.

92.     Pursuant to Section 3426.3 of the California Civil Code, Movement is entitled to recover its damages incurred by virtue of Defendant's wrongful misuse of its trade secrets, in addition to disgorgement of all amounts by which Defendant has been unjustly enriched or the payment of a reasonable royalty, in an amount to be proven at trial.

93.     In performing the conduct described herein, Defendant acted willfully and maliciously, intending to injure Movement and to wrongfully obtain an advantage at Movement's expense.  Pursuant to Section 3426.3 of the California Civil Code, Movement is entitled to all remedies available under the law to compensate Movement, including but not limited to, an award of exemplary damages against Defendant.

94.     Pursuant to Section 3426.4 of the California Civil Code, Movement is also entitled to an award of its attorneys' fees and costs incurred in this action.

**COUNT III**

**<u>Tortious Interference with Contractual Relations</u>**

95.     Movement incorporates all previous paragraphs as if fully set forth herein.

96.     Movement entered into contractual agreements with its Former Employees, including but not limited to Pennington and Plymale, that included, among other things, certain restrictive covenants and confidentiality agreements.

97.     Upon information and belief, Defendant knew that Movement had contractual agreements with these Former Employees that included certain restrictive covenants which he induced them to violate.

COMPLAINT

98.     As alleged in detail above, Scrima was aware of and caused and ordered the misappropriation of Movement's confidential information and trade secrets through these employees, inducing and causing them to violate their contractual obligations with Movement.

99.     Defendant knew that his misconduct would cause Movement to lose employees and business.  He engaged in such misconduct with the purpose of causing this loss.

100.     As a result of Defendant's purposeful actions, Movement has suffered and continues to suffer damages in the form of monetary losses.

101.     Upon   information   and   belief,   Defendant   took   these   actions   to   eco 3014025847/Hathaway - Eminent Domain Actionnomically harm his competitor, Movement, for his own enrichment and that of his company.

**COUNT IV**

**Unfair Competition in Violation of California Business
and Professions Code Section 17200, *et seq.***

102.     Movement incorporates all previous paragraphs as if fully set forth herein.

103.     Movement brings this action pursuant to §17200 *et. seq.* of the Bus. & Prof. Code, the Unfair Competition Act (the "UCL").

104.     Movement brings this claim pursuant to *Bus. & Prof. Code §17204* which prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice." Movement seeks compensation for the loss of its property and the personal financial impacts they have suffered as a result of the unfair business practices Defendant has directed his company to engage in. Movement suffered injury, damages in fact and out of pocket loss due to Defendant's unlawful, unfair, unconscionable, deceptive, conduct and practices, as described above.

105.     Defendant's conduct, as described above, has been and continues to be detrimental to Movement who is seeking to enforce important rights affecting the public interest within the meaning of the *Code of Civil Procedure §1021.5.*

106.     Defendant's acts, as alleged herein, including but not limited to his improper solicitation of Movement's borrowers, tortious interference with contracts, and aiding and abetting

COMPLAINT

breaches of fiduciary obligations and duties of loyalty, and misappropriation of trade secrets and confidential and proprietary information, constitute unfair, unlawful, or fraudulent business practices in violation of *Business and Professions Code §17200 et. seq.*  Defendant's acts and practices described herein offend established public policies, and involve business practices that are immoral, unethical, oppressive, and/or unscrupulous.

107.    Defendant improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), intentionally and willfully caused and directed the theft of Movement's trade secrets and confidential and proprietary information for his personal use and for the benefit of his company.

108.    This information is related to Movement's products or services, as well as customer information used in commerce.

109.    Movement's employees who were impermissibly solicited, were entrusted with trade secrets and confidential and proprietary information in the performance of their jobs.

110.    Defendant utilized such protected and closely guarded information without Movement's express or implied consent, all to Movement's detriment.

111.    As a direct result of Defendant's Actions, Movement was harmed and continues to be harmed.  Due to Defendant's unfair and/or deceptive acts, which caused significant negative impact to Movement's business activities.  Movement is entitled to treble damages and to recover reasonable attorneys' fees.

**COUNT V**

**Civil Conspiracy**

112.    Movement incorporates all previous paragraphs as if fully set forth herein.

113.    Beginning in or about March 2023, Scrima conspired to take the tortious actions described herein against Movement together with certain Movement employees.

114.    Defendant took the tortuous actions described herein, in direct violation of applicable laws, for the primary purpose of acquiring and misusing Movement's trade secrets and confidential and proprietary information as well as to solicit Movement employees and customers,

COMPLAINT

thereby usurping the business opportunities of Movement for his personal benefit and for that of his company.

115.   As a result of Defendant's conspiracy to take tortious and unlawful action against Movement, Movement suffered and continues to suffer substantial economic impact and monetary damages.

**COUNT VI**

**<u>Violation of California Penal Code § 502</u>**

116.   Movement incorporates all previous paragraphs as if fully set forth herein.

117.   California's Comprehensive Computer Data Access and Fraud Act (CCDAFA) determines an individual as guilty of an offense who "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1).

118.   It is similarly an offense by anyone who "Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2).

119.   It is further an offense by anyone who "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section." Cal. Penal Code § 502(c)(6).

120.   The statute entitles the owner of the data to "bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." Cal. Penal Code § 502(e)(1).

121.   Movement's confidential and proprietary information includes, among other things, training materials, lead lists and leads, nonpublic borrower financial and personal information, and pipeline reports were saved in its computer network.

COMPLAINT

122. Additionally, the stolen information included reports and data about Movement employees, their productivity, performance, compensation, and recent loan origination activities, as well as private contact information, all of which would provide a competitor a significant advantage in recruiting and soliciting them to leave the Company.

123. Movement derives independent economic value from its confidential computer data and trades secrets including its borrower information, customer lists, customer data, employee data, and pricing information.

124. Former Employees, including but not limited to Deran Pennington and Lynda Plymale, were entrusted with access to Movement's computer system and this trade secret information in the performance of their jobs.

125. Pennington improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets, including but not limited to Movement's P&Ls, for the use and benefit of Scrima and his company.

126. Plymale improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets for the use and benefit of Scrima and his company.

127. Scrima was aware of and facilitated Pennington and Plymale in taking and using these trade secrets.

128. Scrima coordinated Plymale's access of Movement's computer system from his company's offices after her employment with Movement had been terminated.

129. Scrima reviewed, utilized, directed, and permitted the use of this computer data and trade secrets and confidential and proprietary information by his company for his own personal benefit and for the benefit of the company he managed.

130. Defendant utilized such computer data and accessed Movement's system without its express or implied consent, all to Movement's detriment.

131. As a direct result of Defendant's Actions, Movement was harmed and continues to be harmed.

COMPLAINT

132.     Pursuant to Section 502(e)(2) of the California Penal Code, Movement is also entitled to an award of its attorneys' fees and costs incurred in this action.

133.     In this prohibited access of Movement's computer data, Scrima "has been guilty of oppression, fraud, or malice as defined in subdivision (c) of Section 3294 of the Civil Code" and, as such, "the court may additionally award punitive or exemplary damages."  Cal. Penal Code § 502(e)(4).

## **PRAYER FOR RELIEF**

**WHEREFORE**, as to all counts, Movement respectfully requests that the Court enter judgment in its favor and award the following relief:

A.     Five Million dollars ($5,000,000.00) in actual damages or such other amount as may be proven at Trial;

B.     Trebling of actual damages arising out of Movement's conspiracy claim, DTA, CUTSA, UCLs, and/or CCDAFA;

C.     Punitive damages arising out of Defendant's statutory violations in an amount not less than Twenty-Five Million Dollars (25,000,000.00)

D.     Pre- and post- judgment interest;

E.     Costs;

F.     Statutory attorneys' fees; *and*

G.     Granting Movement such other and further relief as the Court may deem just, equitable, and proper.

## **Demand for Jury Trial**

Movement respectfully requests and demands a jury trial on all issues so triable.

COMPLAINT

Respectfully submitted this 12th day of December, 2023.

/s/ Corey Johanningmeier
Denise M. De Mory (SBN 168076)
ddemory@bdiplaw.com
Corey Johanningmeier (SBN 251297)
cjohanningmeier@bdiplaw.com
Michael Flynn-O'Brien (SBN 291301)
mflynnobrien@bdiplaw.com
Gareth De Walt (SBN 261479)
   (*pro hac vice forthcoming*)
gdewalt@bdiplaw.com
Bunsow De Mory LLP
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7248

Ari Karen (*pro hac vice forthcoming*)
V. Amanda Witts (*pro hac vice forthcoming*)
Alexnader Rogosa (*pro hac vice forthcoming*)
MITCHELL SANDLER LLC
1120 20th Street NW, Suite 725
Washington, DC 20036
Office: (202) 886-5265
E-mail: akaren@mitchellsandler.com
vawitts@mitchellsandler.com
arogosa@mitchellsandler.com

Attorneys for Plaintiff
MOVEMENT MORTGAGE, LLC

COMPLAINT